IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID: WWW.FACEBOOK.COM/QUAES.ZANDER THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. 2:24-mj-00032<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A TRACKING WARRANT**

I, **Ambra M. Dunn**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a Special Agent employed by the United States Department of Justice, the Drug Enforcement Administration (hereinafter "DEA"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants.  I have been employed as a Special Agent of the DEA since January 2018.  I am currently assigned to the DEA Charleston District Office, Charleston, West Virginia.  I have received 17 weeks of training in narcotics investigations and related legal matters while attending the DEA Training Academy in Quantico, Virginia. Prior to my employment as a Special Agent with the DEA, I was employed as a Police Officer by the City of East Point, Georgia Police

1

Department for approximately seven years and then assigned to the DEA Atlanta Field Division as a Task Force Officer for approximately two years. I am currently assigned to the DEA Charleston District Office, High Intensity Drug Trafficking Area ("HIDTA") Group 1.

2.     During my tenure with the DEA, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored and transcribed wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking.  Through my training, education, and experience, I have become familiar with (a) the manner and methods by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

3.  Through my training and experience, I am aware that drug traffickers often communicate with their customers, couriers, transporters, and/or associates through the use of standard hardline telephones, cellular telephones, or the use of multiple

2

telephones or devices, to avoid detection by law enforcement. I am also aware that drug traffickers commonly use social media accounts such as Facebook, TikTok, Snap Chat, as well as other software applications to coordinate drug transactions. I am aware that it is also common for narcotics traffickers to flaunt their drug proceeds (money) and/or material purchases on their social media accounts.

4.   Among other duties, I am participating in an investigation relating to the distribution of controlled substances by GREGORY ZANDER, also known as "Q", "Nephew", "Quaes", and "Quez" (hereinafter "ZANDER"); and other persons both known and as yet unknown (the "SUBJECT INDIVIDUALS" or "SUBJECTS").

## PURPOSE OF THIS AFFIDAVIT

5.   I make this affidavit in support of an application for a search warrant for information associated with the following account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a social networking company headquartered in Menlo Park, California: the account identified as "Quaes El-Bow ZANDER" with user ID: www.facebook.com/quaes.zander (hereinafter "TARGET PROFILE"). The TARGET PROFILE is a social media profile believed to be used by ZANDER.

6.   The TARGET PROFILE is stored at a premises controlled by Meta Platforms, Inc., a provider of electronic communication and

remote computing services, headquartered at Meta Platforms, Inc. ("Facebook"), 1601 Willow Road, Menlo Park, California, 94025. The information to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1) (A), 2703(c) (1)(A), and 2703(d) to require Facebook to disclose to the government copies of the information (including the content of communications) described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section II of Attachment B. Attachments A and B are incorporated herein by reference.

7.     In or about August 2023, law enforcement began an investigation into ZANDER who resided in Charleston, Kanawha County, West Virginia.    As this investigation continued, investigators learned that ZANDER is a distributor of bulk amounts of methamphetamine and heroin/fentanyl in the Charleston, West Virginia area. Based on my participation in this investigation, I respectfully submit that there is probable cause that information associated with the TARGET PROFILE will lead to evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute and Distribution of Controlled Substances), 18 U.S.C. § 922(g)(1) (Felon in Possession

4

of a Firearm), and 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate the Commission of a Drug Trafficking Offense), as described more particularly in Attachment B.

8.   On January 16, 2024, the Honorable Dwane L. Tinsley, United States Magistrate Judge in the Southern District of West Virginia, authorized a court order for the installation and use of pen register and trap and trace device on the TARGET PROFILE.

9.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses as well as my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information (ESI). This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## **JURISDICTION**

10.   This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a "district court of the United States (including a magistrate judge of such court). . . that- has jurisdiction over the offense being investigated." 18 U.S.C. § 2711 (3)(A)(1).

## PROBABLE CAUSE

11. ZANDER was convicted on or about September 22, 2021, in the Kanawha County Circuit Court in Charleston, Kanawha County, West Virginia, case number 20-F-295, of the felony offense of Possession with Intent to Deliver Methamphetamine in violation of West Virginia Code § 60A-4-401, a crime punishable by imprisonment for a term exceeding one year.

12. On or about August 11, 2023 and October 12, 2023, law enforcement obtained search warrants issued by Kanawha County, West Virginia, Magistrates for the TARGET PROFILE. During a review of the information obtained as a result of serving the search warrants, investigators noticed images/videos of ZANDER with large amounts of money. In addition, based on my training and experience, there were multiple conversations between ZANDER and other individuals regarding the distribution of controlled substances. For example, on September 13, 2023, a Facebook Messenger conversation between ZANDER and Facebook User "James Emmanuel Roscoe Pullen" ("PULLEN") occurred. Here is a portion of their conversation:

PULLEN:   U gonna be busy round noon bra, think can get with ya today?

ZANDER:   Wat tryn do

PULLEN:   Got 250 bro

PULLEN:   What'd u say when I was hangin up? U got some good
or stuff from last time. Anyways mom n I leaving crib now.
Can I get few extra if u can man

PULLEN:   DG

ZANDER:   Yea

PULLEN:   Up here

ZANDER:   Here I come

PULLEN:   Ya ya mom said

PULLEN:   Going n or what

ZANDER:   Wat car

PULLEN:   Equinox

PULLEN:   Gold

ZANDER:   My girl comin

PULLEN:   K

13.   Based on my training, experience, and the investigation
thus far, I believe that PULLEN told ZANDER that he had $250 for
the purchase of controlled substances ("Got 250 bro"). ZANDER
stated that a female was going to conduct the drug transaction
("My girl comin").

14.   In October 2023, law enforcement developed an informant
(hereinafter, "CI2") who provided information about ZANDER. CI2
hopes that in exchange for his/her cooperation, CI2 will avoid any
future prosecution for Conspiracy to Distribute Fentanyl/Heroin
and receive monetary compensation.  Investigators observed within

records provided pursuant to a Search Warrant directed to Facebook that CI2 had been communicating with ZANDER through Facebook Messenger. CI2 agreed to conduct controlled purchases from ZANDER and other persons connected to ZANDER, to include Brandon SOLOMON ("SOLOMON"). No promises have been made to CI2 by investigators. CI2's information has proven to be reliable and has been corroborated by other facts learned in this investigation. CI2 has previous convictions for Conspiracy to Distribute Heroin, Probation Violation, Embezzlement, and Possession of Controlled Substances. Since October 2023, CI2 has completed multiple successful controlled drug purchases. The information provided by CI2 has been corroborated by the audio and video recordings of CI2's controlled methamphetamine and heroin/fentanyl purchases, officer surveillance, GPS tracker information, and toll and pen register analysis.

15. On October 1, 2023, SOLOMON posted a public video on Facebook and tagged ZANDER in the video. The video caption was "Gots to know I'm on whatever he on Quaes El-bow Zander". The video showed ZANDER in the passenger seat of a vehicle with a large amount of loose U.S. Currency on and around his person. The video also shows a large amount of U.S. Currency inside and outside of the vehicle on the driver's side where it appears SOLOMON is recording the video from. Below are two screenshots from the video, with the first one showing U.S. Currency inside and outside

the driver's side of the vehicle and the second one showing ZANDER
sitting in the passenger seat while holding U.S. Currency.

 

16.    On October 11, 2023, SOLOMON posted a video of ZANDER
in a parking lot of a carwash in South Charleston, West Virginia,
holding a red bag that contained a large amount of U.S. Currency.
The video caption was "A day in the life of Fresh and Quez".   I
know that "Fresh" is a nickname used by SOLOMON.   During the video,
ZANDER displayed a large amount of U.S. Currency separated by
rubber bands to the camera. ZANDER told SOLOMON that it is "16
bands" and that it is "chump change".   Based on my training and
experience, "16 bands" means $16,000.   Below are two screenshots
from that video, with the first one showing ZANDER holding the red

9

bag and the second one showing the open red bag with the U.S. Currency inside.   Both screenshots display the Facebook profile name associated with ZANDER.




17.   Based on database checks, surveillance, and ZANDER's parole reports from West Virginia Probation and Parole, it does not appear that ZANDER or SOLOMON have legal employment that would yield the amount of money shown in the above-described videos.

18.   On January 9, 2024, investigators spoke to the manager of Bridgeport Equipment, 1504 Oakhurst Drive, South Charleston, West Virginia. The manager stated that ZANDER had come to his store on January 8, 2024, and he handled three different rifles. The manager stated he had the make, model, and serial numbers of the

guns ZANDER handled and would provide all the information and photos on January 11, 2024 when he returned to work. Investigators spoke with employees at Bridgeport Equipment on January 9, 2024, who advised that Isaiah JOHNSON ("JOHNSON") had just purchased a firearm and has purchased firearms from the store in the past. The employees stated that JOHNSON is known in the Bridgeport Equipment store located in Beckley, West Virginia and has been refused service there before for suspicious purchases. The rifle JOHNSON purchased on January 9, 2024, was described as an MP5 style rifle in 308 caliber, valued between $1,100 and $1,200.

19.    Investigators traveled directly to Cabela's, 200 Cross Terrace Boulevard, Charleston, West Virginia after leaving Bridgeport Equipment. Surveillance officers located JOHNSON in the store. JOHNSON was accompanied by ZANDER. The two were in the gun section of the store. Surveillance officers observed JOHNSON purchase a gun case and JOHNSON was then handed something by ZANDER to purchase for ZANDER. Investigators believed the item to be ammunition.

20.    JOHNSON is an associate of ZANDER. Based on my training, experience, and the investigation thus far, I believe that JOHNSON is assisting in obtaining firearms and ammunition for ZANDER. JOHNSON and ZANDER were observed together by surveillance officers on March 4, 2024, arriving at Bridgeport Equipment, 1504 Oakhurst Drive, Charleston, West Virginia, and on March 9, 2024, at Valley

11

Outdoors, 3034 Mount Vernon Road, Hurricane, West Virginia. Facebook Pen data for March 4, 2024, and March 9, 2024, shows JOHNSON and ZANDER in contact with each other via Facebook messages and calls.

21.   On or about February 2, 2024, CI2 screen recorded a Facebook Messenger call with ZANDER.  No audio was captured by the recording of the video call.  During that call, ZANDER showed CI2 what appeared to be heroin/fentanyl.  Based on the Facebook Pen Register, ZANDER was utilizing WiFi during the call and the call was coming from IP Address 50.110.151.168.  A subpoena was served on Frontier Communications to determine the subscriber associated with that IP Address, and Frontier provided the last known subscriber as "Gregory Zander, 1517 Lewis St. Apt C, Charleston, WV."  CI2 advised that ZANDER told CI2 during the call that ZANDER thought SOLOMON was cutting the heroin/fentanyl too much which was causing customers to complain.  CI2 advised that ZANDER told CI2 that CI2 can come directly to ZANDER to purchase the heroin/fentanyl.

22.   On or about March 03, 2024, law enforcement met with CI2. CI2 advised investigators that s/he had been in contact with ZANDER via a Facebook audio call and could conduct a controlled drug transaction for $2,000 worth of fentanyl from ZANDER. CI2 stated that the drug transaction should take place on the East End

12

of Charleston, West Virginia at a location where s/he had met ZANDER previously.

23.  At approximately 11:35 PM on the same date, investigators searched CI2's person and vehicle and they were both found to be free and clear of any controlled substances or U.S. Currency. At approximately 11:36 PM, CI2 was provided with $2,000 of pre-recorded buy money. At approximately 11:38 PM, CI2 was provided with a live GPS, audio, and video recording device. CI2 then traveled to the pre-arranged meeting location. Investigators followed CI2 to the location and remained in close proximity to monitor the drug transaction and for CI2's safety. At approximately 11:47 PM, CI2 contacted ZANDER and told him that s/he was in the area and had $2,000. Law enforcement observed the GPS trackers on a Chevrolet Suburban, driven by SOLOMON, and a Blue Chevrolet Silverado, driven by ZANDER, as both vehicles traveled from Kanawha City, Charleston, West Virginia to 1517 Lewis Street, Charleston, West Virginia. Using aerial (drone) surveillance, law enforcement observed ZANDER remove a bag from the Blue Chevrolet Silverado and then both ZANDER and SOLOMON entered 1517 Lewis Street, Charleston, West Virginia with an unknown male who was carrying a bag. At approximately 12:08 AM, on March 4, 2024, CI2 and ZANDER spoke by phone again. ZANDER told CI2 that he was on the West Side of Charleston, West Virginia and that he was going to have SOLOMON meet him/her. At approximately 12:15 AM on the same date,

investigators observed, using aerial (drone) surveillance, SOLOMON exit 1517 Lewis Street, Charleston, West Virginia and enter the Blue Chevrolet Silverado. SOLOMON then drove to the agreed upon meeting location. CI2 exited his/her vehicle and conducted the drug transaction with SOLOMON out of the driver's side of the Blue Chevrolet Silverado. Following the drug transaction, CI2 departed the area to return to law enforcement.

24. At approximately, 12:29 AM, on the same date, law enforcement met with CI2. At this time, CI2 provided investigators with a plastic bag that contained suspected heroin/fentanyl. CI2's person and vehicle were searched again by investigators, and both were found free and clear of any controlled substances or U.S. currency. CI2 advised that ZANDER said he would sell CI2 a pound of methamphetamine for $3,000. The suspected heroin/fentanyl weighed approximately 17 grams and field tested positive for the presence of fentanyl.

**BACKGROUND**

25. Drug traffickers will often use social media accounts, such as Facebook/Facebook Messenger, Facebook Audio/ Video calls, Snap Chat, Instagram, TikTok, etc. to coordinate obtaining, transferring, and distributing illegal drugs or to communicate with their co-conspirators in the furtherance of their drug distribution. Drug traffickers also flaunt their drug proceeds on

14

their social media platforms as well. I believe the requested information will help identify ZANDER and other co-conspirators associated with the distribution of illegal drugs.

26.   Meta Platforms owns a free-access social networking website by the name of Facebook, that can be accessed at https://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, other social media platforms, and sometimes with the general public.

27.   Facebook asks users to provide basic contact and personal identifying information, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

28.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of

Facebook and can exchange communications of view information about each other. Each Facebook user's account includes a list of that user's "Friends," including information such as profile changes, upcoming events, and birthdays.

29.   Facebook users can select different levels of privacy for the communications and information associated with their Facebook account. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

30.   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at

16

particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

31.   Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when he/she uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

32.   Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profile of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice calling

features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

33.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

34.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

35.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

36.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user's Facebook page.

37.   Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

38.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of the application may appear on the user's profile page.

39.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

40.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquires, or complaints from other users. Social networking providers like Facebook typically

retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.   As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.   Further, Facebook account activity can show how and when the account was accessed or used.   For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.   By determining the physical location associated with the logged IP addresses, investigators can understand the

20

chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*i.e.*, information indicating a plan to commit a crime), or consciousness of guilt (*i.e.*, deleting account information in an effort to conceal evidence from law enforcement).

42. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**ELECTRONIC COMMUNICATIONS PRIVACY ACT**

43.    I anticipate executing the requested warrant for the listed account under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

44.    Based on my training and experience, and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe the information associated with the **TARGET PROFILE,** as more particularly described in Attachment A and Attachment B, constitutes violations of 21 U.S.C. §§ 841(a)(1) and 843(b), and 18 U.S.C. § 922(g)(1).

45.    I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachments A and B. Because the warrant for the **TARGET PROFILE** described in Attachments A and B will be served on Facebook

22

Inc., who will then compile the requested records at times convenient to that entity, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

46.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).   Specifically, the Court is "a district court of the United States. . . that — has jurisdiction over the offense being investigated."   18 U.S.C. § 2711(3)(A)(i).   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Ambra M. Dunn
Special Agent
Drug Enforcement Administration

Sworn to me by telephone or other reliable or other reliable electronic means on March ___19___, 2024.

Honorable DWANE L. TINSLEY
United States Magistrate Judge

24